IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NEIL LOFQUIST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 13−cv−835−MJR−SCW |
| | ) |
| DR. NWAOBASI, | ) |
| DR. SHEARING, and | ) |
| DR. TROST | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**REAGAN, Chief District Judge:**

Plaintiff filed this cause of action on August 14, 2013 while incarcerated at Menard Correctional Center, alleging deliberate indifference to serious medical needs against Defendants as a result of his sciatica and foot drop. (Doc. 1). Upon threshold review, the Court determined that Plaintiff had stated a deliberate indifference claim against Defendant Nwaobasi. (Doc. 6). On June 18, 2014, Plaintiff filed a motion seeking to amend his complaint. (Doc. 35). The Court granted the amendment, but as Plaintiff had not prepared a proposed amended complaint, the Clerk of Court was directed to send him a blank complaint form. (Doc. 39). Plaintiff then sought leave to file his newly drafted amended complaint, which named Shearing and Trost as Defendants. (Doc. 40). Specifically, that order found that Plaintiff had adequately stated an indifference claim against Shearing, and added Trost solely for the purposes of injunctive relief as the medical director at Menard Correctional Center. (Doc. 41).

1

On August 17, 2015, Defendants Nwaobasi, Shearing, and Trost filed the present motion for summary judgment. (Doc. 75). Plaintiff then filed a motion to stay, alleging that Defendants had not complied with some of the magistrate judge's previous orders regarding discovery. (Doc. 78). The magistrate judge granted the motion in part, ordering Defendants to respond to certain discovery requests of Plaintiff and extending the time for Plaintiff to respond to the motion for summary judgment until November 9, 2015. (Doc. 81). Plaintiff then sought another extension on the grounds that Menard was experiencing an outbreak of chicken pox, which interfered with his ability to use the law library. (Doc. 82). Plaintiff was then granted another extension until December 2, 2015. (Doc. 83). Plaintiff filed his response on December 2, 2015. (Doc. 84).

## FACTUAL BACKGROUND

Plaintiff has been incarcerated at Menard since April 2009. (Doc. 76-1, p. 2). A nurse saw Plaintiff on October 18, 2011 for back pain. (Doc. 76-1, p. 2). The nurse took Plaintiff's vital signs and gave Plaintiff ibuprofen. (Doc. 76-1, p. 3). Plaintiff rated his pain as a 4 or 5 out of ten. (Doc. 76-2, p. 2). Plaintiff later inconsistently stated in his "declaration" that on that day he rated his pain an 8. (Doc. 84-1, p. 3). Plaintiff described the pain as in his left buttock and left calf. (Doc. 76-2, p. 2). Plaintiff reported some limitation with movement, but no gait disturbance. (Doc. 76-2, p. 2).

Plaintiff then saw a medical technician ("med-tech") on October 31, 2011. (Doc. 76-1, p. 3). Plaintiff reported that he had a microdiscectomy in December 2000. (Doc. 76-1, p. 3). After the December 2000 surgery, Plaintiff's back pain dissipated. (Doc. 76-1, p. 3). The med-tech took Plaintiff's vital signs and referred Plaintiff to the prison

physician. (Doc. 76-1, p.3). Plaintiff rated his pain as 8 out of 10 on that visit and noted that ibuprofen was not helping him. (Doc. 76-2, p. 3).

Plaintiff saw a female doctor on November 3, 2011, although he could not recall her name. (Doc. 76-1, p. 3). He does not recall that doctor conducting a physical examination, although he discussed his symptoms with her and she prescribed Naprosyn and gave Plaintiff a week's supply of Flexeril. (Doc. 76-1, p.4). The medical records indicate that the doctor found no tenderness in Plaintiff's left calf or left gluteal area. (Doc. 76-2, p. 4). The chart also noted an abnormal "LFT"—seemingly a reference to a liver function test. (Doc. 76-2, p. 4). Plaintiff recalls that the doctor was confident those medications would address his pain. (Doc. 76-1, p. 4). Plaintiff also believes that this doctor told him he had sciatica, and the chart states "sciatica??" (Doc. 76-2, p. 4).

Plaintiff sent a "kite" to the medical unit on November 16, 2011 asking for more Flexeril, but the chart noted that the doctor had only prescribed it for one week and that no refills were available. (Doc. 84-3, p. 19). On January 2, 2012, Janet Brauer reviewed Plaintiff's chart and noted that he needed an appointment to follow up on his low back pain, in part because he was asking for medication renewals. (Doc. 84-3, p. 20).

Plaintiff saw a med-tech again on February 24, 2012. (Doc. 76-1, p. 4). Plaintiff reported that his pain was a 10 on a scale of 1-10, that he had pain with movement, gait disturbance, and pain with changing from sitting to standing. (Doc. 84-3, p. 21). He also alleged that his pain woke him at night, and described it as tingling and radiating from his left buttock down to his left leg. (Doc. 84-3, p. 21). Plaintiff's vitals were normal. (Doc. 84-3, p. 21). The tech referred Plaintiff to the doctor. (Doc. 84-3, p. 21).

3

Plaintiff alleges that he briefly held a job as an inmate porter around that time, but that his walking was unstable due to the pain in his left leg and the officer in charge would not retain him. (Doc. 76-1, p. 4). Plaintiff's cumulative counseling summary reflects that his counselor put him in for a property clerk job, a kitchen post, an HCU job, an NII Gallery position, an IPGC job, and a vegetable house post. (Doc. 84-3, p. 14). While he was approved for certain jobs, he was denied placement. (Doc. 84-3, p. 14).

Plaintiff was scheduled to see Dr. Krieg, who is not a defendant here, on March 1, 2012, but the visit was cancelled because the doctor called into work. (Doc. 84-3, p. 22). Plaintiff complained to the CMT on March 5th and March 10th about his back pain and noted that he was having difficulty working and did not want to lose his job. (Doc. 84-3, p. 22). The CMT noted that he was already scheduled to see the doctor. (Doc. 84-3, p. 22). A CMT entry dated March 15, 2012 notes that Plaintiff was scheduled to see the doctor but that security did not bring him to the appointment. (Doc. 84-3, p. 23).

Plaintiff saw another med-tech around March 19, 2012. (Doc. 76-1, p. 4). On this visit, Plaintiff rated his pain as a 9. (Doc. 76-2, p. 5). Plaintiff reported back pain and speculated that the pain came from hopping off his top bunk—he said that he hopped on and off his bunk five times a day. (Doc. 76-1, p. 4). Plaintiff also reported pain in his calf. (Doc. 76-1, p. 5). The chart notes that the pain is sciatic. (Doc. 76-2, p. 5). The chart also notes that Plaintiff's range of motion and movement is decreased. (Doc. 76-2, p. 5). The med-tech referred him to the doctor and gave Plaintiff ibuprofen. (Doc. 76-1, p. 5). Plaintiff reported that his other medication had run out. (Doc. 76-2, p. 5).

Plaintiff had another doctor visit scheduled for March 20, 2012, but the institution was on lockdown and his appointment was cancelled. (Doc. 76-2, p. 6).

Plaintiff saw Nwaobasi for the first time on March 23, 2012. (Doc. 76-1, p. 5). He ordered x-rays during that visit and prescribed Neurontin and Naprosyn. (Doc. 76-1, p. 5). He did not examine Plaintiff, and Plaintiff did not explain that he thought his problems stemmed from jumping off the top bunk of his bed. (Doc. 76-1, p. 5). Plaintiff told Nwaobasi that he had problems sleeping at night and that his pain had been "severe" for approximately one month. (Doc. 76-1, p. 5). Nwaobasi's assessment is that Plaintiff had sciatic pain in his left lower limb. (Doc. 76-2, p. 6).

The x-ray was performed on March 29, 2012. (Doc. 76-1, p. 5). The x-ray showed straightening of lumbar lordosis, and noted that the vertebral body heights were maintained without facture. (Doc. 76-2, p. 7). The fact that vertebral heights had been maintained meant that none of the vertebrae in Plaintiff's spine were misaligned or impinging on the roots of his nerves. (Doc. 76-3, p. 3). The x-ray also noted mild diffuse degenerative changes with small osteophyte formation. (Doc. 76-2, p. 7). An osteophyte is a bony growth formed on normal bone, which can be treated with non-steroidal anti-inflammatory pain medication. (Doc. 76-3, p. 3). No aggressive appearing osseous destruction or erosion was seen. (Doc. 76-2, p. 7).

Plaintiff alleges that on April 14, 2012, he awoke in severe pain, and asked his cellmate to call a nurse. (Doc. 84-1, p. 5-6). The nurse hid outside of the door so that Plaintiff could not see her and told the guard there was nothing she could do. (Doc. 84-1, p. 6). Plaintiff then alleges that he fainted from exhaustion. (Doc. 84-1, p. 6).

5

Nwaobasi then reviewed the x-ray with Plaintiff on April 20, 2012 and told Plaintiff that he had mild to moderate arthritis. (Doc. 76-1, p. 5). Nwaobasi said that he would increase Plaintiff's Neurontin, but there was little he could do for arthritis. (Doc. 76-1, p. 5). Plaintiff alleges that he was taken to this appointment in a wheelchair, but that four days later the wheelchair was taken away. (Doc. 84-1, p. 6).

On May 5, 2012, Plaintiff saw Nurse Jeremy Butler and told him that he could not move his toes. (Doc. 76-1, p. 6). Butler examined Plaintiff and showed him some strengthening and stretching exercises. (Doc. 76-1, p. 6).

Nwaobasi examined Plaintiff again on May 10, 2012, and renewed Plaintiff's prescriptions for Naprosyn and Neurontin. (Doc. 76-1, p. 6). Plaintiff told Nwaobasi that he was still in a lot of pain, and that he was concerned about the atrophy in the side of his left calf. (Doc. 76-1, p. 6). Nwaobasi repeated that there was nothing more that he could do and that he would not send Plaintiff to a specialist or order an MRI. (Doc. 76-1, p. 6). Nwaobasi never actually examined Plaintiff's left foot or his back. (Doc. 76-1, p. 6). Nwaobasi testified in an affidavit that the osteophyte could be impinging on the nerve and causing Plaintiff's foot drop. (Doc. 76-3, p.3). In Nwaobasi's medical opinion, the osteophyte could be treated with conservative treatment, including nerve pain medication, non-steroidal medication, and stretching/strengthening exercises. (Doc. 76-3, p. 3). This opinion was based on the x-ray report, Plaintiff's complaints, and Nwaobasi's medical training. (Doc. 76-3, p.3). Plaintiff alleges that he used a plastic chair as a walker to get to this appointment. (Doc. 84-1, p. 7).

Plaintiff saw the med-tech again on May 5, 2012. (Doc. 76-1, p. 6). Plaintiff requested a slow walk permit at that time because everything below his left knee was "not functioning well" and because he was in a lot of pain. (Doc. 76-1, p. 7). Plaintiff noticed in the month before the appointment that he was having difficulty moving as fast as the other inmates. (Doc. 76-1, p. 7). The tech's examination showed a strength difference between the left and right foot with extension. (Doc. 76-2, p. 9). It also noted that capillary refill was less than three seconds on the left great toe. (Doc. 76-2, p. 9).

Plaintiff saw Nwaobasi again on May 10, 2012 due to his complaints of left foot drop and wasting. (Doc. 76-2, p. 10). Nwaobasi renewed Plaintiff's prescriptions of Neurontin and Naprosyn for four months. (Doc. 76-2, p. 10). His objective assessment was that Plaintiff complaints were caused by the mild diffuse degenerative changes in Plaintiff's back. (Doc. 76-2, p. 10). Specifically, the small osteophyte observed in Plaintiff's x-ray may have been impinging on the nerve and causing him the pain and foot drop. (Doc. 76-3, p. 3). Because the osteophyte was small, it was Nwaobasi's medical opinion that conservative treatment was the most appropriate course. (Doc. 76-3, p. 3). Nwaobasi scheduled a follow-up for six months. (Doc. 76-2, p. 10).

Plaintiff saw M. Oakley on May 25, 2012. (Doc. 84-3, p. 30). He continued to complain of lower back pain and rated his pain as a 6-8 on a scale of 10. (Doc. 84-3, p. 30). He also reported that he was out of Naprosyn. (Doc. 84-3, p. 30). The CMT reported that Plaintiff limped with walking, and that he bent at the waist while walking. (Doc. 84-3, p. 30). No swelling was noted at the back. (Doc. 84-3, p. 30).

Plaintiff then saw Kim Criss on May 31, 2012. (Doc. 76-1, p. 7). She issued Plaintiff a slow walk permit, a low gallery permit, and a low bunk permit. (Doc. 76-1, p. 7). She also offered Plaintiff a leg brace, but Plaintiff declined because he thought the brace would tear up his shoes. (Doc. 76-1, p. 7). Plaintiff later inconsistently alleged that he denied the leg brace because it was only a cloth compression sleeve. (Doc. 84-1, p. 7). Criss told Plaintiff that his condition was foot-drop. (Doc. 76-1, p. 7).

On August 1, 2012, Plaintiff saw nurse practitioner Kohring. (Doc. 76-1, p. 7). She gave Plaintiff a medical shower permit for one year and a front cuff permit based on his report that he had fallen while walking to the showers while the prison was on lockdown the previous month. (Doc. 76-1, p. 7). Plaintiff also asked Kohring about some cancelled appointments with Dr. Shepherd. (Doc. 76-1, p. 7-8).

In September 2012, Nwaobasi renewed Plaintiff's medication. (Doc. 76-2, p. 10).

Plaintiff saw Dr. Shearing on November 16, 2012. (Doc. 76-1, p. 8). Shearing examined his left lower leg. (Doc. 76-1, p. 8). Shearing performed a motor exam to test Plaintiff's muscle strength, and Plaintiff scored 5/5, or normal strength. (Doc. 76-4, p. 1). Shearing then performed a test of Plaintiff's deep tendon reflexes and Plaintiff's score was 2+, which is normal. (Doc. 76-4, p.1). Shearing also performed a straight leg raise test, which did not indicate that Plaintiff had a herniated disc. (Doc. 76-4, p. 1). Plaintiff alleges that these tests did not test his affected muscles, and Shearing did not examine his foot because he did not allow Plaintiff to remove his shoe. (Doc. 84-1, p. 8). Plaintiff asked Shearing to send him to a specialist, but Shearing said no because he did not see the need. (Doc. 76-1, p. 8). Shearing also renewed Plaintiff's Naprosyn and

Neurontin—the latter for three months only with instructions to discontinue it after that time. (Doc. 76-2, p. 14). Shearing discontinued the Neurontin because it is a medication that is for nerve pain, it is inappropriate for a patient without nerve pain, and because the test he performed showed no evidence of a herniated disc. (Doc. 76-4, p. 2).

Plaintiff's cumulative counseling summary alludes to a response Shearing sent to a note of Plaintiff's. The note states: "1) There is nothing in your record to suggest that you should not exercise regularly, either in your cell or out when permitted by security. 2) There is no reason that you should not be able to work again. I encourage you to return to work if permitted. 3) Your cholesterol numbers have generally been good. 4) I don't believe you need any special treatments such as electromuscular stimulation. You should be able to return to your regular activities." (Doc. 84-3, p. 13).

Plaintiff saw Shearing again on May 23, 2013, and asked him to renew his permits. (Doc. 76-1, p. 8). Shearing performed another motor exam, and Plaintiff was normal. (Doc. 76-4, p. 2). The deep tendon reflex test was also normal. (Doc. 76-4, p. 2). Plaintiff's straight leg test also showed no indication of nerve pain. (Doc. 76-4, p. 2). Shearing told Plaintiff that he did not qualify for permits. (Doc. 76-1, p. 8; Doc. 76-2, p. 15). Plaintiff testified at his deposition that Shearing stated that Plaintiff had to be over 70 years old, over 300 lbs, or half paralyzed to get the permits he wanted. (Doc. 76-1, p. 8). Plaintiff's declaration inconsistently states that Shearing told him he was not renewing the permits because inmates had been abusing them, but that if Plaintiff's safety officer reported that Plaintiff was falling frequently, Shearing would revisit the issue. (Doc, 84-1, p. 8). Shearing renewed Plaintiff's prescription. (Doc. 76-1, p. 8).

Plaintiff described his pain as intermittent during this time and further testified that he occasionally attempted to deal with his pain without medication. (Doc. 76-1, p. 8).

Plaintiff renewed his request for permits when he saw Shearing on August 9, 2013, but Shearing again denied them on the grounds that Plaintiff did not meet the criteria for permits based on Shearing's prior examination. (Doc. 76-2, p. 16; Doc. 76-4, p. 2). Plaintiff filed his federal complaint in this Court a few days later.

Trost, who is only present in this case for the purposes of injunctive relief, saw Plaintiff on June 12, 2014. (Doc. 76-5, p. 2). Plaintiff reported chronic low back pain and foot drop for the past two years. (Doc. 76-5, p. 2). He also reported that ibuprofen helped his pain. (Doc. 76-5, p. 2). Trost reviewed the x-ray taken in 2012 and noted that it showed a small osteophyte on his spine. (Doc. 76-5, p. 2). Trost's examination of Plaintiff revealed that Plaintiff could not stand on his heels. (Doc. 76-5, p. 2). Based on his review of the patient's history and his examination, Trost concluded that Plaintiff's complaints could be addressed by conservative treatment, including ibuprofen and an ankle brace. (Doc. 76-5, p. 2). Trost believe that an ankle brace would provide stability while walking, but Plaintiff refused the ankle brace. (Doc. 76-5, p. 2).

Plaintiff reported difficulty walking during a nurse's visit on October 25, 2014. (Doc. 76-5, p. 2). Plaintiff was also seen by Dr. Fuentes, another physician at Menard, on November 7, 2014. At that time, Fuentes issued a low bunk permit, a double cuff permit, and a sleeve for Plaintiff's left ankle. (Doc. 76-5, p. 2). Plaintiff's request for a front cuff permit was denied because those permits present security risks and are only issued to inmates when medically necessary. (Doc. 76-5, p. 3). Trost felt a front cuff

permit was not necessary because Plaintiff's complaints of instability were addressed by his ankle sleeve and his double cuff permit. (Doc. 76-5, p. 3).

Wexford's orthopedic surgery guidelines, submitted by Plaintiff as a part of the summary judgment briefing, recommend bed rest for a nerve deficit like foot drop. (Doc. 84-6, p. 8). For chronic back pain with instability, the recommendation is heat, NSAIDS (specifically ibuprofen), muscle relaxants, and range of motion exercises. (Doc. 84-6, p. 8-9). For both conditions, the decision to refer to an outside referral is recommended to occur "at the discretion of the clinician." (Doc. 84-6, p. 9).

Plaintiff also submitted a document that had criteria for low bunk/low gallery and criteria for alternative cuffing. (Doc. 84-7, p. 4). The criteria for low bunk/low gallery permits included seizure disorders, amputation of limbs, paraplegic or hemi-paralysis, 6 weeks post major surgery, markedly obese (over 350 lbs), and elderly age (greater than 70 years). (Doc. 84-7, p. 4). The criteria for alternate cuffing states that the offender must be unable to cross his wrists behind his back, and specifically states that alternate cuffing will no longer be permitted for joint pain, arthritis, or artificial hips if the offender is able to cross his wrists behind his back. (Doc. 84-7, p. 4).

LEGAL STANDARDS

1. **Summary Judgment Standard**

Summary judgment is proper only if the admissible evidence considered as a whole shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. ***Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011) (*citing* Fed. R. Civ. P. 56(a)).** The party seeking summary

judgment bears the initial burden of demonstrating—based on the pleadings, affidavits and/or information obtained via discovery—the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, **477 U.S. 317, 323 (1986).** In determining whether a genuine issue of fact exists, the Court must view the record in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 255 (1986).**

At summary judgment, the Court's role is not to evaluate the weight of the evidence, to judge witness credibility, or to determine the truth of the matter, but rather to determine whether a genuine issue of triable fact exists. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, **528 F.3d 508, 512 (7th Cir. 2008)**.

## 2. Eighth Amendment Deliberate Indifference

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishment" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, **414 F.3d 645, 652–53 (7th Cir. 2005)**. A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm, but not to demand specific care. *Forbes v. Edgar*, **112 F.3d 262, 267 (7th Cir. 1997).**

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, **658 F.3d 742, 750 (7th Cir. 2011).** The first prong examines whether the prisoner has shown he has an objectively serious medical need. *Id.* **at 750.** A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, **593 F.3d 610, 620 (7th Cir. 2010).** Only if the objective prong is

satisfied is it necessary to analyze the second prong, which focuses on whether a defendant's state of mind was sufficiently culpable. *Greeno*, **414 F.3d at 652–53.**

Prevailing on the second prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Id.* **at 653.** The plaintiff need not show that the physician literally ignored his complaint, just that the physician was aware of the serious condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, **546 F.3d 516, 524 (7th Cir. 2008).** Courts give deference to physicians' treatment decisions, since "there is not one proper way to practice medicine, but rather a range of acceptable courses." *Jackson v. Kotter*, **541 F.3d 688, 697–98 (7th Cir. 2008).** A doctor who chooses one routine medical procedure over another does not violate the Eighth Amendment. *McGowan v. Hulick*, **612 F.3d 636, 641 (7th Cir. 2010);** *see also Estelle v. Gamble*, **429 U.S. 97, 107 (1976) (whether additional diagnostic techniques or treatments were needed was a "classic example of a matter for medical judgment.").** However, persisting in a course of treatment known to be ineffective states a claim under the Eighth Amendment. *Greeno*, **414 F.3d at 655 (finding deliberate indifference where defendants persisted in a course of conservative treatment for eighteen months despite no improvement).** Deliberate indifference may also be shown when a medical provider refuses to refer a patient to a specialist for treatment of a condition that clearly requires a referral. *Berry v. Peterman*, **604 F.3d 435, 440 (7th Cir. 2010);** *Hayes*, **546 F.3d at 526.**

## DISCUSSION

**Dr. Nwaobasi**

The parties do not appear to be disputing that Plaintiff's condition is a serious medical condition under the objective factor test. Therefore, the Court will limit its analysis to whether the defendants were subjectively culpable.

Plaintiff appears to be arguing that Nwaobasi is culpable due to a delay in prescribing him pain medication. Plaintiff was initially given ibuprofen for his back pain on October 18, 2011. Two weeks later, Plaintiff saw a CMT and noted that the ibuprofen was not helping him. He then saw an unnamed medical staff person, either a doctor or a nurse practitioner, who prescribed stronger medication on November 3, 2011. Plaintiff consistently sought more medication after that medication ran out, but although his chart repeatedly stated that he had a doctor's appointment, the appointment was deferred until he saw Nwaobasi on March 23, 2012. On one occasion, the doctor called in to work, and on another the institution was on lockdown.

While it appears to the Court that Plaintiff may have gone without pain medication for a period of time between November 2011 and March 2012, there is no evidence that Nwaobasi was aware of this circumstance. Nwaobasi did not see Plaintiff for the first time until the March 23, 2012 appointment. He was not the doctor that called in sick on one of Plaintiff's earlier appointments, and there is no evidence that he had any control over prison lockdowns. In the absence of some evidence that Nwaobasi was personally involved in the chain of events that caused Plaintiff to go without medication during this time period, Nwaobasi is entitled to judgment in his favor.

Plaintiff has also generally alluded to the fact throughout his filings that he was in pain due to Defendants' conduct. However, the medical records never record any statement from Plaintiff that his prescriptions were not controlling his pain, and Plaintiff's prescriptions were repeatedly renewed for the purpose of controlling it after he saw Nwaobasi. In fact, although Plaintiff repeatedly testified that he was in pain during his deposition at various medical appointments, he also described his pain as "intermittent" and testified that he would stop taking his medication when his pain levels went down because he was wary of taking medication that he did not need. In the absence of any documented request from Plaintiff to change Plaintiff's pain medication, Nwaobasi cannot be held liable for Plaintiff's pain, particularly in light of Plaintiff's testimony that he was non-compliant with his prescriptions.

The Court also finds that no reasonable jury could find that Nwaobasi was deliberately indifferent based on the actions that he did take. Nwaobasi ordered x-rays, evaluated the x-rays, and prescribed Plaintiff medication for his nerve and muscle pain. Plaintiff was also taught strengthening and stretching exercises by a nurse at this time. This is consistent with exhibits submitted by Plaintiff that show that treatment for his condition may include braces, shoe inserts, physical therapy, bed rest, NSAIDS, and muscle relaxants. (Doc. 84-7). While those documents also list surgery as an option, Nwaobasi submitted evidence that in his opinion, Plaintiff's condition could be treated conservatively because the x-ray showed that all disc heights had been maintained, which implied that Plaintiff did not have issues with his discs impinging on his nerves. The medical records reflect that Plaintiff refused a brace twice before finally accepting a

sleeve provided by Dr. Fuentes in 2014.  Plaintiff merely disagrees with the course of treatment that has been provided to him.  No reasonable jury could find Nwaobasi deliberately indifferent on the circumstances of this case.

### Dr. Shearing

Shearing is not entitled to summary judgment on this record.  The medical records establish that Plaintiff's condition was worsening with time.  Plaintiff experienced increased pain and decreased mobility.  He began experiencing foot drop while Nwaobasi was treating him.  However, when Shearing evaluated Plaintiff's treatment, he actually decided that Plaintiff did not need as many therapeutic interventions as what had been previously provided.  Shearing cancelled Plaintiff's medical permits on non-medical grounds when he refused to renew them because other inmates had been abusing the permit process.  Shearing also discounted Plaintiff's report that his condition kept him from holding a prison job.  Additionally, although Shearing did examine Plaintiff, he never referred Plaintiff for an MRI, which would have definitively shown whether Plaintiff had nerve impingement or not.

While conservative treatment does not violate the Eighth Amendment, Shearing continued Plaintiff on a course of treatment that Plaintiff describes as ineffective to control his pain and foot symptoms, without conducting sufficient tests to determine the necessity of that treatment.  He also discontinued some medical interventions on non-medical grounds.  Shearing is not entitled to summary judgment on these facts.

### Dr. Trost

Trost is only in this case for the purposes of injunctive relief. Plaintiff makes two requests for injunctive relief, namely that all of his medical permits be reissued and that he be referred to an outside specialist. Trost has represented to the Court that Plaintiff currently has all of the medical permits previously issued aside from a front-cuff permit. Therefore, to the extent that Plaintiff has a request for injunctive relief for any permit other than a front-cuff permit, that request is moot and must be denied.

Plaintiff's testimony was that he wanted a front-cuff permit because he sometimes fell while walking and wanted to be able to catch himself. Three doctors have evaluated Plaintiff and determined that a double cuff permit and an ankle sleeve permit give Plaintiff more stability when walking and are sufficient. Additionally, Plaintiff's own evidence suggests that alternative cuffing is not appropriate for arthritis or when an inmate can cross his hands behind his back. Plaintiff has submitted no evidence that his condition prevents him from crossing his hands behind his back.

Under the Prisoner Litigation Relief Act, the Court can only order injunctive relief to the extent "necessary to correct the violation of the Federal right of a particular plaintiff." **18 U.S.C. § 3626(a)(1)**. Here, on these facts, there is no violation of a federal right on the front cuff permit point because Plaintiff has gotten other permits and interventions meant to address the concerns that would be addressed by a front permit.

As to Plaintiff's request for referral to an outside medical specialist, there is not enough evidence in the record for the Court to rule on this request at this time. Therefore, Plaintiff's request for injunctive relief for a medical referral will proceed.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Doc. 75) is **GRANTED in part** and **DENIED in part**.  As to Defendant Nwaobasi, the Clerk of the Court is instructed to dismiss him as a party and enter judgment in his favor at the close of this case.  Plaintiff's request for injunctive relief is **DENIED** as to his request for medical permits, but his request for an outside specialist will remain.  Plaintiff's claims against Shearing will also proceed to trial.

**IT IS SO ORDERED.**

**DATED:  March 4, 2016**

/s/ **Michael J. Reagan**
**Chief Judge Michael J. Reagan**
**United States District Court**